UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| MATTIE FRYE, personal representative ) <br> of the Estate of ELLISON LEE FRYE, ) <br>       Plaintiff, ) <br> ) <br>       v. ) <br> ) <br> CITY OF GARY, CITY OF GARY ) <br> POLICE DEPARTMENT, OFFICER ) <br> JAMAAL B. JOSEPH in his individual and ) <br> official capacities, OFFICER JEREMY D. ) <br> JOSEPH in his individual and official ) <br> capacities, and UNKNOWN OFFICERS ) <br> OF THE GARY POLICE DEPARTMENT ) <br> in their individual and official capacities, ) <br>       Defendants. ) | Cause No.: 2:13-CV-46-PRC |

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment [DE 31], filed on April 21, 2014.

### I. Procedural Background

Plaintiff Mattie Frye, the personal representative of the Estate of Ellison Lee Frye (Ellison), filed a two-count Complaint in Lake County, Indiana, Circuit Court on January 2, 2013, alleging that Defendants violated Ellison's federal constitutional rights by shooting and killing him during a January 1, 2011 traffic stop. The Complaint also alleges that Defendants violated Ellison's rights under Indiana common law and the Indiana State Constitution. Defendants removed this case to the United States District Court for the Northern District of Indiana on January 29, 2013. Defendants moved for summary judgment on all of Plaintiff's claims on April 21, 2014. This matter became fully briefed on May 30, 2014.

The parties filed forms of consent to have this case assigned to a United States Magistrate

Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## II. Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56 (c)). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar

materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110–11 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor

of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249–50.

### III. Material Facts

There are two quite different accounts of what happened the night Ellison was shot and killed. Rather than attempt to combine the two into one narrative, the Court lays both accounts side-by-side. Of course, because this is a Motion for Summary Judgment brought by Defendants, where there are conflicts—either about the evidence or the inferences from it—they are resolved in Plaintiff's favor.

#### a. The Police Officers' Account

In the early morning hours of New Year's day, 2011, Gary Police Officer Steven Peek (Officer Peek is not a Defendant in this case) was working his beat in the Miller area of Gary, Indiana. While there, he saw a green Pontiac Bonneville quickly driving north along Lake Street. The car sped over a set of railroad tracks with enough speed to become airborne. At the same time, Defendant Officers Jeremy and Jamaal Joseph (the shared last name is no coincidence—they're brothers) also spotted the Bonneville and noticed that its license plate light was not working properly. They also saw it run a red light and drive on the wrong side of the road.

Both Officer Peek and Officers Jeremy and Jamaal Joseph activated their lights and sirens and began to pursue the Pontiac in their marked Gary Police squad cars. After driving some distance, the Pontiac turned onto Kennedy Terrace, a street that is part of the parking lot of Lake Shore Dunes

Apartments. Officer Peek pulled in behind the Pontiac, while Officers Jamaal and Jeremy Joseph continued past in an attempt to head the car off if the driver attempted to get back onto the main road.

In his deposition, Officer Peek testified that, after pulling into the Lake Shore Dunes Apartments parking lot, the Pontiac stopped. Officer Peek explained that he stopped his squad car about three feet behind the Pontiac, got out, and began approaching it. Officer Peek testified that the driver—Ellison—stuck his head out of his driver-side window, looked back at Officer Peek, and then sped off around the corner and out of sight. Officer Peek testified that he then hurried back to his squad car and began getting ready to follow when—about twenty seconds after the Pontiac drove off—he heard rapid gunfire.

Defendant Officers Jamaal and Jeremy Joseph testified in their depositions that they continued past Kennedy Terrace in an attempt to head the suspect off. Shortly thereafter, the Pontiac drove around a corner towards them. They testified that the Pontiac stopped and that Officer Jamaal Joseph exited his squad car, drew his handgun, and began flanking—that is, indirectly approaching—the Pontiac, ordering the driver to show his hands. Officer Jeremy Joseph explained that he also exited the car, brandishing his rifle, after the driver refused to comply with his brother's orders. They testified that the driver then put the car in reverse, turning his car so he could drive past the squad car. Ellison made eye contact with Officer Jamaal Joseph (who was still shouting to the driver to show his hands) and began driving forward towards him. Officer Jamaal Joseph testified that he yelled at the driver to stop. He explained that he ran backward through the parking lot, attempting to escape being run over and that the Bonneville hit him head-on, throwing him onto its hood.

5

Officer Jamaal Joseph testified that he was in fear for his life and that he pointed his handgun at the windshield and began shooting. Officer Jeremy Joseph testified that he also began shooting once he thought the car was running his brother over. Officer Jamaal Joseph testified that he was able to roll off the hood unscathed, while the car rammed into a structural barrier. The Officers testified that they approached the car and found Ellison unresponsive. He was later pronounced dead at the scene.

### b. Witness Rosalind Lanier-Martin's Account

The account of the police is contradicted in at least two respects by the deposition testimony of Rosalind Lanier-Martin. She testified that she was in one of the apartment buildings in Lake Shore Dunes Apartments that night buying crack cocaine (she wasn't high at the time). She testified that she looked out of a window and saw two police cars at one end and another police car at the other end of the parking lot of the apartment complex. She testified that she saw three men (she didn't know who any of them were) standing outside of the apartment building and that they abruptly broke apart and ran. Two of them sprinted toward the squad cars. The third hurried to a car—which she vaguely remembered as being green—got in, and began driving. She testified that the green car spun out, hit a parked car, and then crashed into some sort of pavement barrier or brick wall. She explained that it was only after the car came to a stop that the officers opened fire. Moreover, she testified that she never saw the green car hit or even come close to any of the officers.

Lanier-Martin testified that she left the scene quickly after the shooting—she claims that she did not even wait to get her money back from the crack dealer. She testified that she did not know who was shot until later, after being told by a friend that it was Ellison. She kept her account to herself until after this case began.

6

### c. Use-of-Force Training

Officer Peek testified that the Gary Police Department has a use of force policy and that he had received instruction in it. Officer Peek explained the policy as follows: interactions begin with verbal command and then escalate to soft hand contact, then hard hand contact, then to pepper spray, then to a taser, and then, finally, to deadly force. He testified further that there are some circumstances where deadly force is permitted. Both Officers Jeremy and Jamaal Joseph testified that they have been trained in the use of force. Officer Jeremy Joseph testified that he had received his training before his time at the police academy. The training, according to Officer Jamaal Joseph's testimony, was part of the police department's standard operating procedure.

## IV. Analysis

As a threshold matter, Defendants urge the Court to discount the deposition testimony given by Lanier-Martin. Defendants go on at length in their reply brief arguing that the Court should not believe Lanier-Martin's testimony because she was addicted to crack cocaine, because she is friends with a man named Cedrick Mullins who is Plaintiff's boyfriend, and because she did not come forward with her story until after this lawsuit was filed. These objections address credibility and are thus not for the Court to consider on summary judgment.

Defendants also argue that the testimony of Lanier-Martin "should be completely stricken and disregarded" as "unreliable speculation" and "hearsay" because Lanier-Martin did not know the identity of the decedent at the time she says she witnessed the shooting, but only discovered it later, second hand. Defs. Reply 2. They write that "Martin cannot testify based on personal knowledge that the 'incident' she alleges to have witnessed has anything to do with this case." *Id.* Thus, they argue that she impermissibly "connected the dots" based on hearsay. *Id.*

7

This argument is unconvincing. Witnesses do not need to know the identity of those they see. Rather, witnesses must have personal knowledge about what they are testifying about. *See* Fed R. Evid. 602.

Lanier-Martin testified that she was at the place that all parties agree is *where* the shooting took place on the same night that all parties agree is *when* the shooting took place. Thus, though her testimony about the identity of the person she saw that night is hearsay, her testimony about what she claims to have seen is not. It is reasonable to infer from this that the shooting she claims to have witnessed was the same one at issue in this case. Thus, as far as a summary judgment motion is concerned, the Court accepts as true Lanier-Martin's testimony that she did not see the car drive anywhere near any of the officers and that the officers only began shooting *after* the car had crashed into the barrier and come to a halt.

### a. State Law Claims

Defendants contend that they are entitled to summary judgment on all of Plaintiff's state law claims because Plaintiff did not comply with the notice provision of the Indiana Tort Claims Act (ITCA). *See* Ind. Code § 34-13-3-8 *et seq.* (barring claims against political subdivisions unless the plaintiff notifies the governing body of the political subdivision along with the Indiana political subdivision risk management commission within 180 days after the loss occurred). Plaintiff did not respond to this argument, so any defenses she might have had to it are waived. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 598 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned). Summary judgment is thus appropriate against Plaintiff as to all her state-law claims.

### b. Qualified Immunity

Defendant Officers contend that they are entitled to qualified immunity. "[G]overnmental actors performing discretionary functions enjoy qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *In re Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (quoting *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

In determining whether a state actor is shielded from liability by qualified immunity, a court must consider "whether, taking the facts in the light most favorable to the plaintiff, the officers' conduct violated a constitutional right," and "whether the particular constitutional right was 'clearly established,' at the time of the alleged violation." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts have discretion about which of the two inquiries to address first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 229 (2009)). A right is "clearly established" when there is either a closely analogous case that establishes that the conduct is unconstitutional or when the violation is so obvious that a reasonable state actor would know that his actions violated the Constitution. *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001) (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1022 (7th Cir. 2000)).

Claims of "excessive force in an arrest, investigatory stop, or other 'seizure' of [one's] person" are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989); *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003); U.S. Const. amend. IV. "The officer's subjective belief or motivations are irrelevant." *Scott*, 346 F.3d at 756 (citing *Graham*, 490 U.S. at 397). What matters under the Constitution is the perspective of a

reasonable officer at the scene. *Graham*, 490 U.S. at 396.

For deadly force to be reasonable, "the officer must have probable cause to believe that the suspect poses a threat of serious physical harm to the officer or to others." *Tennesee v. Garner*, 472 U.S. 1, 7 (1985); *Rincon v. United States*, 2:10-CV-268 PS, 2012 WL 1981725, at \*4 (N.D. Ind. June 1, 2012) ("A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable." (citing *Garner*, 472 U.S. at 7)). And, if feasible, the officer must give some warning first. *Garner*, 472 U.S. at 7.

Courts have routinely held that the prospect of being run over by a car can put a reasonable officer in fear of death or serious injury, justifying the use of deadly force. *See, e.g.*, *Soriano v. Town of Cicero*, No. 10–3352, 2013 WL 1296780 (7th Cir. Apr. 2, 2013); *Washington v. Schumann*, 2:09-CV-270-PRC, 2013 WL 5314610, at \*4 (N.D. Ind. Sept. 19, 2013). But summary judgment is not appropriate when, as here, there is a genuine dispute about whether the officers were faced with a driver using his car as a deadly weapon or a would-be fugitive who posed little or no danger to the police or to bystanders. *See Scott*, 346 F.3d at 757–58; *Rincon*, 2012 WL 1981725, at \*4. As mentioned above, Lanier-Martin testified that Ellison's car did not come anywhere near Defendant Officers (or anyone else) and, thus, a reasonable juror could find that Ellison did not pose a threat serious enough to justify the use of deadly force. And regardless of whether Ellison ever did pose a threat, Lanier-Martin testified that Defendant Officers only began shooting *after* the car had crashed and come to a halt. In considering her account, any danger Ellison posed had dissipated by the time Defendant Officers opened fire. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993); *Rincon*, 2012 WL 1981725, at \*5 (analyzing a similar situation).

It is clearly established in this appellate circuit that shooting someone who no longer poses

a threat is a violation of that person's constitutional rights. *See Ellis*, 999 F.2d at 747; *Scott*, 346 F.3d at 757. The Motion for Summary Judgment on this basis is hence denied.

### c. *Monell* Liability

In addition to suing the Officers who shot and killed Ellison in their individual capacities, Plaintiff also brings *Monell* claims against the City of Gary, its Police Department, and Defendant Officers in their official capacities. Municipalities cannot be held liable for § 1983 violations under the theory of *respondeat superior*; rather, a local government may be held liable only "when [the] execution of a government's policy or custom . . . inflicts the injury" for which the government is sued under § 1983. *Monell v. Dept of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978). Establishing a policy or custom can be done in three ways; the Plaintiff must present evidence that there was either:

> (1) an express policy that causes a constitutional deprivation when enforced;
>
> (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or
>
> (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir. 2012) (citing *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007)). There must also be a causal relationship between the policy and the alleged constitutional violation such that the official policy is the "moving force" behind the constitutional deprivation. *Id*. at 833 (citing *Estate of Sims*, 506 F.3d at 515 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

In *Canton*, the Supreme Court held that a municipality's failure to train its employees could be considered an actionable "custom or policy" under § 1983 when the failure to train in a "relevant respect" demonstrates a "deliberate indifference" to its inhabitants' rights. *Canton*, 489 U.S. at 388. Deliberate indifference can be established by showing that the municipality either "fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation" or "fails to provide further training after learning of a pattern of constitutional violations by the [employees]." *Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir. 2003) (citations omitted). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, — U.S. —, —, 131 S. Ct. 1350, 1359 (2011).

Defendants confidently assert that this is irrelevant since Plaintiff alleges only a single instance of unconstitutional action and *Connick* "conclusively held that there can be no Section 1983 liability for failure to train based on a single violation." Defs. Reply 8. Defendants misstate the law. While is true, generally, that an allegation of a single incident of unconstitutional activity is not sufficient to support the inference that the activity was taken pursuant to an official policy, *id.* at 1360 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (2000))); *Williams v. Heavener*, 217 F.3d 529, 532 (7th Cir. 2000)(citing *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994)), "the [*Canton*] Court left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference," *Connick*, 131 S. Ct. at 1361

(citing *Bryan Cnty.*, 520 U.S. at 409).

In *Canton*, the Supreme Court gave the hypothetical of a city arming and deploying its police force with firearms to capture fleeing felons without training the officers in the constitutional limitations on lethal force. *Id.* (citing *Canton*, 489 U.S. at 390 n. 10). The Supreme Court "theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights." *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409). *Canton* did not "foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.*

As mentioned, Plaintiff's sole *Monell* argument is that the single instance of Ellison's shooting establishes an unconstitutional failure to train. The undisputed evidence is that the Gary Police Department had a use-of-force policy and that Gary Police Officers were trained in the use of force. It is also undisputed that the training was not done by the City, but before the Officers' time at the police academy. Plaintiff contends that this distinction is significant, since the City of Gary did not itself train the Officers it employed. But, as the *Connick* court explained, it is not the "absence of any formal training sessions" or the "particular instructional format" that matters, but rather the "substance of the training." *Connick*, 131 S. Ct. at 1363 (emphasis removed). While the evidence about the substance of the training on use of force is limited, the record makes evident that the officers understood that force had to be used in a continuum, beginning with a verbal command, then proceeding to soft hand contact, hard hand contact, pepper spray, taser, and finally deadly force. This differs markedly from the hypothetical in *Canton*, which involved no training of anyone.

*Canton*, 489 U.S. at 390 n. 10. And while there might be circumstances in which the training given was too little and too long ago, that is not the case here, as evidenced by Officer Peek's testimony about his knowledge of Gary's use-of-force continuum. *Cf. Estate of Williams v. Ind. State Police*, 2:12-CV-00324-JMS, 2014 WL 2693892, at *30 (S.D. Ind. June 13, 2014) ("[F]ollowing *Connick*, courts have found sufficient evidence of 'single-incident liability' only where there was a complete absence of training on the relevant subject—just as the *Canton* hypothetical suggests." (citing *Thomas v. Cumberland Cnty.,* 749 F.3d 217, 225 (3d Cir. 2014))).

Because the City of Gary did not unconstitutionally fail to train its officers in the use of force, it cannot be liable under the single-instance theory. And since failure to train is Plaintiff's sole *Monell* argument, the Court accordingly grants summary judgment in Defendants' favor on all of Plaintiff's claims against the City of Gary, the Gary Police Department, and the Defendant Officers in their official capacities.

### d. Punitive Damages

Defendants also argue that Plaintiff's claims for punitive damages are barred as a matter of law. This is true, of course, regarding the municipal defendants, since they are entitled to summary judgment as to all claims against them, and also regarding all state-law tort liability against the Officers since those claims have also been dismissed.

Defendants contend that the ITCA bars not only any claim for state-law punitive damages, but also those brought under § 1983. In saying this, Defendants again misstate the law. The ITCA does apply "to pendant state court claims within a § 1983 suit." *Alexander v. City of S.Bend*, 256 F. Supp. 2d 865, 875 (N.D. Ind. 2003) (citing *Meury v. Eagle-Union Cmty. Sch. Corp.*, 714 N.E.2d 233, 242 (Ind. Ct. App. 1999)). But it does not apply to the § 1983 claims themselves. *Felder v.*

14

*Casey*, 487 U.S. 131, 140 (1988) ("[N]otice-of-claim provisions are inapplicable to § 1983 actions brought in federal court.").

A "jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983). According to Lanier-Martin's testimony, Ellison never came near the Officers in his attempt to escape and was shot by the Officers after he had crashed his car into a barrier and come to a stop. A reasonable factfinder could conclude that the shooting was done with reckless or callous indifference to Ellison's constitutional rights. The Court thus denies the motion insofar as it seeks summary judgment on Plaintiff's claims for § 1983 punitive damages against the Defendant Officers in their individual capacities.

## V. Conclusion

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment [DE 31]. The Court grants the motion insofar as it seeks summary judgment on Plaintiff's state-law claims against all Defendants and her *Monell* claims against the City of Gary, the Gary Police Department, and the Defendant Officers in their official capacities. The Court denies the motion insofar as it seeks summary judgment on the § 1983 claims (including claims for punitive damages) against the Defendant Officers in their individual capacities. The Court **REAFFIRMS** the final pretrial conference set for **August 25, 2014, at 10:00 a.m.** (C.S.T.), and the jury trial set for **September 22, 2014, at 9:00 a.m.** (C.S.T.).

SO ORDERED this 6th day of August, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc: All counsel of record